PINDELL v. STATE OF INDIANA.

[No. 24,257.    Filed May 13, 1925.]

1. BURGLARY.—*Circumstantial evidence held sufficient to sustain verdict.*—Upon a charge of stealing tobacco from a barn, evidence showing familiarity of the accused with the location, prints of his peculiar feet and of an automobile truck driven to the barn in the nighttime, together with other circumstances, *held* sufficient to sustain a verdict of guilty of burglary.    p. 180.

2. VENUE.—*Not error to refuse change when no abuse of discretion is shown.*—The granting of a change of venue from the county is within the sound discretion of the court, and when application therefor is made in the language of the statute, and no abuse of discretion is shown, it is not error to overrule the motion.    p. 180.

3. CRIMINAL LAW.—*Refusal of instruction concerning effect of failure of complete alibi not error in view of other instructions.*—It is not error to refuse an instruction that failure of the accused to account for his whereabouts during all the time within which the offense might have been committed is not a circumstance tending to prove guilt in view of other instructions given as to reasonable doubt raised by proof of partial alibi, and that a failure to testify raised no presumption against him.    p. 181.

4. BURGLARY.—*Act of 1915 defining burglary in degrees is now in force.*—Burglary in the second degree is properly charged under Acts 1915, ch. 165, §2 (§2447 Burns 1926, §2268b Burns' Supp. 1921); this act covered the subject matter of Acts 1907, ch. 72, p. 100, and therefore repealed it by §3 repealing all laws and parts of laws in conflict. The act of 1907 being repealed, its attempted amendment by Acts 1921, ch. 117, p. 279, was ineffectual, and the act of 1915 remained in force.    p. 182.

From the Franklin Circuit Court; *Cecil C. Tague,* Judge.

Russell Pindell was convicted of burglary in the second degree, and he appeals. *Affirmed.*

*George W. Pigman* and *Roscoe C. O'Byrne,* for appellant.

*U. S. Lesh,* Attorney-General, and *Mrs. Edward Franklin White,* Deputy Attorney-General, for the State.

EWBANK, J.—Appellant was convicted of breaking into a barn in the nighttime with the felonious intent to steal tobacco stored therein. Overruling his motion for a new trial is the only error assigned, under which he complains of the refusal of the trial court to grant a change of venue from the county, the giving of certain instructions and refusal to give certain others, and that the verdict is not sustained by sufficient evidence and is contrary to law.

The evidence against him was wholly circumstantial. That which most strongly tended to sustain the verdict was as follows: That appellant lived with his parents at the village of Laurel; that prior to December, 1921, he had gone to the farm of Herbert Wolf and looked at his tobacco in the field, and said when it was for sale to let him know; that he "bought tobacco," and the year before had bought 12,000 pounds; that in the night between Friday, December 2, and Saturday, December 3, 1921, the barn of said Herbert Wolf, near Peppertown, in Franklin county, Indiana, about ten miles from Laurel, was entered and about 1,200 pounds of tobacco owned by him, worth twenty-five cents a pound, was carried away; that entrance to the barn was obtained by cutting away certain wires that had been fastened across the doors; that the tobacco had been stripped and "bulked down" on sticks, and what was on

150 sticks had been taken; that those sticks were left in a pile at the side of the lane, some distance from the barn; that rain had fallen and made the ground soft, and tracks made by three persons led back and forth between the barn and that place; that of the three persons one had made "peculiar tracks" of a long, narrow foot, with pointed toed shoes, the size and kind that appellant commonly wore; that the person making these peculiar tracks "set his feet out" so that they "stood at an angle," walked "slue-footed," with his toes turned far out, and made a crooked track; that appellant wore pointed toed shoes and had "crooked" feet that turned out and walked in that manner, and nobody else known to the many witnesses for the state did so, though many turned their feet out some; that two or three automobiles were heard and seen to drive up into the lane late that night and turn off their lights, and later in the night were heard to drive out again; that the tracks made by these cars were such as a Ford car would make with chains on, and led east to Peppertown and then south five miles, through Oldenburg to a bridge, but there were no fresh tracks beyond the bridge; that the tracks made by the chains ended near the bridge, and there were marks which showed where the cars had been backed in taking off the chains, and where "it looked as though they had turned around" and driven "back through Peppertown"; that in going back they would be driving north, toward Metamora, which is five or six miles north of Peppertown, and about ten or eleven miles north of where the chains were taken off; that a search warrant was obtained and the premises where appellant lived with his parents were searched, but no tobacco was found; that appellant drove a Ford car; that two weeks from the following Sunday (December 18) appellant engaged the owner of a Ford truck,

who lived at Laurel, to haul a load of tobacco to. Covington, Kentucky; that appellant told the man to come to a barn near Metamora for the tobacco at about one o'clock the next morning; that this barn was on a tract of 500 acres operated by R. B. (also under indictment for the same offense), but was about a mile distant and across the river from the fields in which tobacco had been raised on that farm, being on the other side of the river from the barn in which that tobacco had been hung when it was cut; that the tobacco raised on that farm was of a much coarser quality than what was taken from the Wolf farm, and the "Pool" had advanced ten cents per pound on 2,400 pounds of it; that the truck driver went to said barn at one o'clock Monday morning, and found R. B. and appellant's brother there, who helped load the 800 pounds of tobacco which had been stripped and was "bulked down" there; that this tobacco was on sawed sticks; that the three men loaded it on the truck and the driver reached Covington with it, sixty miles away, about five o'clock that morning; that ten other trucks were there ahead of him, and he got to unload the tobacco about ten o'clock; that by direction of R. B. the driver had the tobacco put on the floor for sale as the property of C. C. Brown, of Laurel, Indiana; that this was a fictitious name, nobody of that name living at Laurel or in Laurel township, and that C. C. Brown who lived at Metamora, six miles away, had no interest in this or any other crop of leaf tobacco; that the tobacco was put in baskets when it was unloaded, and the sawed sticks were taken back to the driver's home at Laurel, and were never returned to R. B. or to appellant; that the reason given by R. B. for such secrecy and the use of a fictitious name was that he had signed an agreement with the pool for his crop and received an advance on 2,400 pounds, but had about 3,700 pounds, and that under that agreement a penalty

of five cents per pound would be exacted if it were known that he had sold any of his tobacco at Covington; that appellant and R. B. were both in Covington that day; that after the tobacco was unloaded appellant claimed to own it, and told the warehouse men that he had bought it from "C. C. Brown," saying that he had paid $160 for it; that appellant said he "had reported it to the girl at the desk," but there was no girl at the desk for him to have reported it to; that the portions of the load of tobacco put in different baskets were sold at different prices, but one-third of it was sold at thirty-nine cents per pound, and another third at thirty-five and thirty-six cents; that a check for $223.33 drawn to the order of C. C. Brown was made out and signed by the warehouse men on Tuesday, December 20, 1921 (the next day), but they became suspicious and refused to make payment until satisfied who was entitled to the money; that on December 20, R. B. wrote and sent by mail a letter to the warehouse men, dated at Laurel, Indiana, and signed "C. C. Brown," which stated that appellant had paid the writer $160 for the crop, that the writer had "told the clerk about the transfer, and to make the check out to Pindell," and directed them to "send check to Pindell & Son, Laurel, Indiana"; that C. C. Brown of Metamora received a letter from the warehouse men, and under date of "Laurel, Ind. Dec. 23d" R. B. wrote a letter to the warehouse men to which he signed the name of C. C. Brown, as follows: "Received your letter regarding my tobacco this morning. I sold to Pindell and have got my money, so pay him"; that appellant's brother who had helped to load the tobacco addressed this letter to the warehouse men, stamped it, put on a special delivery stamp, and mailed it at Laurel; that still the money was not paid, and on December 29, 1921, R. B. and appellant went to Connersville and told Mr. Frost, who had title, as trustee,

to the farm occupied by R. B., that somebody was charging Pindell with having stolen the tobacco sold at Covington, and accusing R. B. with having some connection with it, and told him how it had been sold in the name of C. C. Brown, and that it had been sold thus because of the agreement which R. B. had with the pool; that in the presence of appellant Mr. Frost dictated a letter which he then signed and sent to the warehouse men, in which he stated that "on or about the 20th of this month there was sold over the floor by you 800 pounds of tobacco that was supposed to have been consigned in the name of C. C. Brown, but was really handled by C. R. Pindell  *  *  *  I happen to be the real owner of the tobacco.  *  *  *  The farm stands in my name as trustee. It seems, for some reason, perhaps suspicioned by somebody that this tobacco was stolen, and the delivery of the check is held up. You will find, upon investigation, that in reality this check should be made to Hyatt L. Frost, trustee *  *  *  and as we are depending on the money to meet an obligation coming due in a few days, kindly issue check to my order, mailing the same to me." And below this appellant indorsed and signed a statement that he "consents to the issue of the check as above and waives all right to any claim therein or to the proceeds from the sale of said tobacco." This evidence is sufficient to support the inference drawn by the jury that appellant was guilty, as charged.

No application was made for a change of judge, and appellant's affidavit for a change of venue from the county merely recited, in the language of the statute (§2235 Burns 1926, §2074 Burns 1914, §203, Acts 1905 p. 584) that upon his oath he "deposes and says that he verily believes that he cannot receive a fair trial of said cause in the county of Franklin owing to the general excitement and prejudice

against the defendant among the inhabitants of said county and in the part of said county where said cause is to be tried." The granting or overruling of such a motion in a prosecution for a felony not punishable by death is committed to the sound discretion of the trial court (§2239 Burns 1926, §2078 Burns 1914, §207, Acts 1905 p..584), and no abuse of discretion is shown in this case. *Leach* v. *State* (1912), 177 Ind. 234, 236, 97 N. E. 792.

The court gave instructions at the request of appellant stating that he had the right not to testify, and that the fact that he did not testify would raise

3. no presumption of any kind against him, and no inference of any kind could be drawn therefrom by the jury, who must not in any manner consider or refer to the fact that the defendant had not gone upon the witness stand; and that if the evidence offered by him to prove an alibi, when considered with all the other evidence in the case, was sufficient to raise in the minds of the jury a reasonable doubt of his guilt he should be acquitted, even though it might fail to account for his whereabouts during all the time the offense probably was being committed. But it refused to give a further instruction that "the failure of the defendant to account for his whereabouts during all the time within which the offense might have been committed is not of itself a circumstance tending to prove his guilt." It was not error to refuse to give such additional instruction. The instructions given to the effect that if the evidence tending to prove an alibi raised a reasonable doubt of appellant's guilt he should be acquitted, even though it only accounted for his whereabouts during part of the time, and that his own failure to testify raised no presumption against him and should not be considered nor referred to by the jury, were sufficiently favorable to the defendant.

By its instruction No. 4 the trial court told the jury that defendant was charged with burglary in the second degree, as defined by a section of the statute, and 4. recited as the language of that statute §2, Acts 1915 p. 619 (§2447 Burns 1926, §2268b Burns' Supp. 1921). This was correct. The act of 1915, *supra*, so far covered the subject-matter of ch. 72, Acts 1907 p. 100, that the provision in section 3 thereof repealing "all laws and parts of laws in conflict herewith" operated as a repeal of said act of 1907. Therefore the attempted amendment of the act of 1907 by Acts 1921 p. 279, was ineffectual, and the act of 1915 remained in force. *Metsker* v. *Whitsell* (1914), 181 Ind. 126, 140, 103 N. E. 1078; *Kramer* v. *Beebe* (1917), 186 Ind. 349, 357, 115 N. E. 83.

The other specifications of error have been waived. The judgment is affirmed.